## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| ISUZU MOTORS LIMITED, | Civil No. 05-2174 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| THERMO KING CORPORATION, | |
| Defendant. | |

Ryan S. Goldstein and Adam J. Bedel, **QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP**, 865 South Figueroa Street, Tenth Floor, Los Angeles, CA 90017; Monte A. Mills and John W. Ursu, **GREENE ESPEL, PLLP**, 200 South Sixth Street, Suite 1200, Minneapolis, MN 55402-1415, for plaintiff.

Karen P. Layng, **VEDDER PRICE, PC**, 222 North LaSalle Street, Suite 2400, Chicago, IL 60601-1003; Daniel C. Adams and Michael J. Steinlage, **LARSON KING, LLP**, 30 East Seventh Street, Suite 2800, St. Paul, MN 5501-4922, for defendant.

Plaintiff Isuzu Motors Limited ("Isuzu") and defendant Thermo King Corporation ("Thermo King") agreed that Isuzu would seek to develop an industrial diesel engine for use in Thermo King's refrigeration units. After Isuzu spent a considerable amount of time developing the engine – without the assurances of a written supply agreement with Thermo King – Thermo King determined that the engine did not meet its requirements and elected not to use it. Isuzu subsequently brought this action alleging claims for promissory estoppel and unjust enrichment. Thermo King now moves for summary

judgment.  For the reasons given below, the Court grants the motion in part and denies it in part.

## BACKGROUND

Isuzu is a company principally based in Tokyo, Japan, that manufactures and sells commercial vehicles and diesel engines.  Thermo King is a company principally based in Bloomington, Minnesota, that manufactures and sells "transport temperature control systems," or refrigeration units.  To power some of its refrigeration units, Thermo King purchases industrial diesel engines.

In 1976, Isuzu began supplying Thermo King with the "D-201" diesel engine for Thermo King's refrigeration units.  The terms of the D-201 purchases were governed by a written Engine Supply and Purchase Agreement.  (Steinlage Aff., Docket No. 96, Ex. B, at 3.)

Some time before July 1999, Thermo King indicated that it was interested in replacing the D-201 with the next generation Isuzu engine "as soon as possible."  (Bedel Aff., Docket No. 103, Ex. 3, at TK 01664.)  Thermo King noted that the engine characteristics on which it was most focused were "weight, noise, vibration, fuel and oil consumption, electronics and competitive pricing."  (*Id*.)  Isuzu later began working to develop the 4LC2 engine, without a written contract between the parties binding Thermo King to any engine purchases.

Isuzu contends that in March 2000, Thermo King provided it with a start of production ("SOP") date, designating August 2001 as Thermo King's target for Isuzu to

begin full-scale production of the 4LC2.  As evidence of this contention, Isuzu points to notes from a company meeting that include a timeline consistent with such a schedule. (*See, e.g.*, Bedel Aff., Docket No. 103, Ex. 9.)  Those notes, however, do not include any express indications that Thermo King had made a binding commitment to actually purchase engines.  In addition, the schedule includes numerous benchmarks to be met before the SOP date, including "Design Review" of component parts, pilot production of a limited set of engines, and a later "Validation" period.  (*Id.*)

On September 20, 2000, Haruhiko Kurokawa, an agent of Isuzu, sent a letter to Thermo King (1) quoting a per-unit price for the 4LC2, and seeking to persuade Thermo King that the price was reasonable; (2) asking Thermo King to bear half of its development costs "if [Isuzu's] engine was adopted by [Thermo King] finally"; (3) quoting a tooling charge; and (4) seeking agreement on a price for prototype engines due to be shipped to Thermo King in October 2000.  (*Id.*, Ex. 13, at TK 04159-63.)

After Thermo King failed to respond, Kurokawa sent another email on September 26, 2000, asking if Thermo King could, at a minimum, "commit to bear [a specified] tooling charge and development cost . . . in case of your project (Isuzu 4LC2 Project) cancellation."  (*Id.*, at TK 04157.)  After Thermo King responded that it was still reviewing Isuzu's proposals, Kurokawa sent another email on October 4, 2000, again seeking Thermo King's commitment to bear particular tooling and engineering costs "in case of your project cancellation."  (*Id.*, at TK 04154.)

On October 31, 2000, Kunihiko Suzuki, another Isuzu agent, proposed that Thermo King cover 65 million yen of its development costs, and noted that it expected to

incur 108 million yen in tooling costs.  (*Id.*, Ex. 16.)  This letter also vaguely sought a
"commitment" from Thermo King by November 3.  (*Id.*)  In response, Thermo King's
supply manager, Gregg Johnson, sent a letter on November 3, 2000, noting that the 4LC2
project was a major investment that would require further corporate approvals.  (*Id.*,
Ex. 14.)   Johnson added, however, "I will approve proceeding with the tooling and
development based on the latest proposal dated October 31, 2000."  (*Id.*, Ex. 14.)
Minutes from a subsequent Isuzu meeting held in January 2001 include a section on
development costs, and state "50% of TK unique specs: [65 million yen] – TK accepted
50% bear."  (*Id.*, Ex. 17.)  The minutes also reference tooling charges of 108 million yen,
and proposed dates for Thermo King to pay these expenses.  (*Id.*)   There are no
indications in the record, however, that Thermo King subsequently made the scheduled
payments.

In the months that followed, the parties continued to discuss the price and details
of the 4LC2 engine, the tooling and development costs, and the production schedule.
(*See id.*, Exs. 18, 21, 22).  A May 15, 2001, email from Isuzu proposed a new, higher
price for the 4LC2, and included on a list of "big pending issues," "[y]our approval of the
specifications/performance of volume production."  (*Id.*, Ex. 22, at TK 00366.)  Thermo
King's responses indicated that they were reviewing Isuzu's proposals.  (*Id.*, at TK
00364.)

On June 26, 2001, Johnson sent an email responding to an undated message from
an Isuzu representative.  (*Id.*, Ex. 23.)  The Isuzu message had referred to exchanges
between the two companies' engineering departments that had "shocked" Thermo King,

but had nonetheless proposed shipment of fifty 4LC2 engines per month from February to May of 2002.  (*Id*.)  Johnson responded that he was "deeply saddened and concerned" about the companies' relationship, mentioned communication difficulties they had experienced, and noted decreased demand for its refrigeration units.  (*Id*.)  Johnson indicated that the SOP would need to be delayed "into at least [the] end of 1st qtr 2002 with our current information."  (*Id*.)  On July 3, 2001, Isuzu sent another letter to Thermo King indicating that it had suffered losses because of the delay, and requesting payment for 20 million yen in tooling costs and 65 million yen in development costs.  (*Id*., Ex. 24.)

On July 16, 2001, the parties met in Minneapolis to continue to discuss the 4LC2 project.  Minutes from that meeting – which are signed by both parties – suggest that the parties agreed to payment schedules for tooling and development costs, in amounts identical to those referenced in Isuzu's October 31, 2000, email (with 108 million yen marked for tooling charges and 65 million yen marked for development charges).  (*Id*., Ex. 20, at TK 01242.)  Those minutes also reference proposed changes to the SOP dates for volume production of the 4LC2 engines, but note that Isuzu still wished to confirm the revised schedule.  (*Id*., at TK 01243.)

On October 17, 2001, the parties met again to discuss the 4LC2 project.  The minutes from that meeting indicated that there were still "several pending issues in development" of the 4LC2, and that Thermo King needed to conduct additional testing "to confirm the quality and performance."  (*Id*., Ex. 25, at ISZ 0327.)  The minutes indicated that the projected production schedule had been pushed back considerably, and that Isuzu still awaited confirmation of that revised schedule.  (*Id*.)  In addressing tooling

and development charges, however, the minutes listed the same charges and payment dates noted in the minutes from the July meeting.  (*Id*., at ISZ 0328.)  In addition, the minutes appeared to include plans for Isuzu to ship ninety-nine prototypes engines to Thermo King.  (*Id*., at ISZ 0329.)

Isuzu alleges that in November 2001, Thermo King confirmed it would be using the 4LC2 engines in its refrigeration units.  As evidence of this, Isuzu points to a document that lists specifications for the engine, as well as various handwritten notes.  (*Id.*, Ex. 29.)  One of those handwritten notes states "No Additional Testing Req'd," followed by an arrow pointing to biodiesel fuel.  (*Id*.)  Another note, however, appears to state "Testing Complete by 2-12-02" – approximately three months after the date of the document – with arrows pointing to "cold startability" and "any parts damage cause [sic] by unit vibration."  (*Id*.)  The document also includes a note stating "Regarding RME base biodiesel fuel, [Thermo King] and [Isuzu] will jointly review the outcome of the planned field test and decide [whether] the fuel is available for . . . use or not."  (*Id*.)

Also in November 2001, Isuzu received an email from Thermo King describing a change in plans.  (*Id*., Ex. 32.)  The email, dated November 14, 2001, stated "[a] lot has happened since our last meeting in Japan."  (*Id*.)  Thermo King informed Isuzu that it was now interested in using the 4LC2 in its "high-end" units.  (*Id*.)  The note indicated that because of this modification, additional testing would be required.  The email concluded, "[o]ur hope is to make a unit decision by May of 2002."  (*Id*.)

From February through the summer of 2002, the parties exchanged drafts of a Memoranda of Agreement, which would have formalized the parties' commitments for

the 4LC2 engine.  (*See, e.g.*, *id.*, Ex. 38.)  Notably, a draft suggested by Thermo King on

June 20, 2002, included provisions stating "[s]pecification review to be scheduled

between TK and Isuzu June 2002," and "SOP scheduled at Thermo King December 2002

predicated on specification and test results from June 2002 review."  (*Id.*, Ex. 37.)  The

parties agree that no final Memorandum of Agreement was ever completed and signed.

In June 2002, the parties signed a "common understanding" concerning the 4LC2

engine.  (*See id.*, Ex. 34.)  This document addressed various issues related to the

specifications for the 4LC2 engine, including compatibility with biodiesel fuel and cold

startability.  Isuzu contends that this document shows that the 4LC2 was still on schedule

for production in October 2002, as it refers to "volume production that will begin in Oct.

2002."  (*Id.*)  However, the passage of that document marked "Conclusion" states, in full:

> Based on the above fact, understanding, and modification, Thermo King
> Engineering and Isuzu Engineering agree that the 4LC2 engine with the
> above volume production specification is not adequate to go into the
> volume production.  Thermo King will review noncompliance of biodiesel
> spec and will notify Isuzu.

(*Id.*)

On February 27, 2003, Thermo King informed Isuzu that it no longer wished to

pursue development of the 4LC2 engine.  (*Id.*, Ex. 41.)  Isuzu's notes from the meeting

on that date indicate that Thermo King listed eight reasons for this decision, including

concerns over Isuzu's financial condition, Isuzu price mark-ups, and engineering and

price issues related to cold startability and biofuel compatibility.  (*Id.*)  Isuzu indicates in

its Complaint that at the time of this cancellation, "the parties had not yet agreed on the final specifications for the 4LC2."[1]  (Compl., Docket No. 1, ¶ 55.)

Following cancellation, Thermo King offered to pay development and tooling costs (65 million and 87.7 million yen, respectively), and purchase 94 prototype units of the 4LC2 engine (for 28.2 million yen).[2]  (*Id.*)  Isuzu alleges that its out-of-pocket costs for development of the 4LC2 exceeded $7 million.

Isuzu brought this action against Thermo King in September 2005, alleging claims for promissory estoppel – for the full complement of engines it believed it was instructed to produce; the tooling and development costs it believes it was promised; and the prototype engines it believes Thermo King promised to purchase – and for unjust enrichment.  In August 2006, this Court stayed the case pending arbitration, after Thermo King argued that this dispute was covered by an arbitration agreement in the sales agreement for the D-201 engine.  *See Isuzu Motors Ltd. v. Thermo King Corp.*, No. 05-2174, 2006 WL 2255436 (D. Minn. Aug. 7, 2006).  The arbitrator later determined that this dispute was not covered by the terms of the parties' arbitration agreement, (*see* Steinlage Aff., Docket No. 96, Ex. E), and Thermo King subsequently brought this motion for summary judgment.

---

[1]  Isuzu now contends that the November document described above – listing specifications and including various handwritten notes on future testing – shows that there was an agreement on the final specifications for the 4LC2 engine.  As noted above, however, that document plainly contemplated additional testing and additional discussions on cold startability and vibration issues.  (Bedel Aff., Docket No. 29.)

[2]  Using current conversion rates, this would total approximately $1.93 million.

# ANALYSIS

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    PROMISSORY ESTOPPEL

"Promissory estoppel is an equitable doctrine that implies a contract in law where none exists in fact."  *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000).  To establish a promissory estoppel claim under Minnesota law, a plaintiff must show (1) the defendant made a "clear and definite" promise; (2) the promisor intended to induce reliance and such reliance occurred; and (3) the promise must be enforced to prevent an injustice.  *Ruud v. Great Plains Supply, Inc.* 526 N.W.2d 369, 372 (Minn. 1995).  The first element requires "that the promisor should reasonably expect to induce action or forbearance on the part of the promisee."  *Martens*, 616 N.W.2d at 746.  Isuzu

alleges that Thermo King made a series of "clear and definite" promises, dealt with separately below.

### A.    Thermo King's Alleged Promises to Purchase the 4LC2 Engine and Pay Isuzu for its Out-of-Pocket Costs (Count II)

#### 1.    Promise to Purchase Volume Quantities of the 4LC2 Engine

Isuzu first alleges that Thermo King promised to purchase "volume quantities" of the 4LC2 engine.[3]  In support of this position, Isuzu contends that (1) Thermo King repeatedly provided Isuzu with SOP dates, which continually expressed its intent to purchase the engines; (2) Thermo King continually provided Isuzu with the number of engines it would need at particular times, which Isuzu contends would have been unnecessary if it was not actually intending to purchase them; and (3) Thermo King attempted to negotiate a memorandum of agreement formalizing the parties' arrangement, reinforcing the notion that Thermo King had assured Isuzu that it would purchase volume quantities of the engines.

In its argument that this claim should be dismissed, Thermo King argues that at least four of its agents informed Isuzu that it would only purchase engines in commercial volume if the engine was (1) competitive, (2) superior to Isuzu's D-201 engine, and (3) sufficient to satisfy Thermo King.  (*See id*., Ex. G, at ¶ 37.)  Thermo King also complains that Isuzu withheld information about its expectations for the engine. Specifically, Thermo King points to a 1994 engineering study in which Isuzu concluded

---

[3] In its brief, Isuzu suggests that this would have amounted to "tens of thousands of finished units per year."

that 4LC2 was its "last candidate" to supply for use in Thermo King's refrigeration units because of cost concerns and its long development schedule.  (*See id*., Ex. C-1, at 3.) Thermo King contends that allowing Isuzu to pursue profits from a subpar product would be inequitable.

The Court agrees that Isuzu has not brought forward sufficient evidence that Thermo King made a "clear and definite promise" to purchase volume quantities of the 4LC2 engines.  As an initial matter, the Court notes that Isuzu has not disputed that the parties actively engaged in efforts to commit their obligations to writing.  The lack of a written contract is a feature of any promissory estoppel case, of course, but it is particularly notable here, because (1) the parties did sign a written agreement governing sales of the 4LC2's predecessor, the D-201; and (2) as set forth above, the parties' efforts to complete a written contract covering the 4LC2 engine failed.  The parties' prior practice of putting their binding obligations in writing, alongside their inability to craft written expressions of their obligations as to the 4LC2, should have provided a strong signal to Isuzu that Thermo King had not yet undertaken a binding commitment to purchase tens of thousands of 4LC2 engines.

Moreover, numerous writings exchanged by the parties in the course of their failed attempts to draft a written agreement, contemplate benchmarks that needed to be met before Thermo King would be fully committed to volume purchases.  For instance, Thermo King's first proposed draft contained a provision stating "SOP scheduled at Thermo King December 2002 predicated on specification and test results from June 2002 review."  (Bedel Aff., Docket No. 103, Ex. 37, at TK 04283, ¶ 5.)  There is reason to

believe that this was more than a formality, for a June 2002 evaluation prepared by the parties includes a joint conclusion that the 4LC2 was not adequate to go into volume production. (*See id.*, Ex. 34.) In addition, there is at least one other June 2002 email in the record in which a Thermo King agent expressly indicated to an Isuzu agent that "we are unable to sign the [memorandum of understanding] at this time as we have not met the specifications required for this engine." (*Id.*, Ex. 39.) In sum, the content of the negotiations over the Memorandum of Agreement further underscore the uncertainties surrounding the underlying product, and the absence of any enforceable promise from Thermo King to commit to volume production.

As to the production schedule discussed by the parties, the Court does not agree that these hypothetical dates, on their own, are sufficient to demonstrate a binding promise to purchase tens of thousands of engines. Isuzu argues that Thermo King first committed to engine purchases when it sent SOP dates in May 2000. In the emails exchanged just months later, however, Kurokawa was clearly still haggling over prices for the finished engines, and was actively seeking some security – in the form of a commitment to tooling and development costs – in case Thermo King declined to go forward. Those emails include nothing suggesting that Kurokawa already considered Thermo King bound to purchase volume quantities of engines, and are simply incompatible with the notion that the parties' obligations were settled.

The production schedule discussions that come closest to suggesting a firm commitment are the communications that occurred in July and October of 2001, which contemplated the provision of specific numbers of engines on specific dates. However,

the minutes from those meetings both indicate that this production schedule was still among the "[i]tems to be confirmed."   (Bedel Aff., Docket No. 103, Exs. 20, 25.) Moreover, Isuzu's only evidence that even approaches demonstrating that engine's specifications were agreed upon is dated November 2001, months after these production schedules were exchanged.[4]  It strains credulity to believe that Thermo King had agreed to purchase tens of thousands of engines before it had agreed on the engine's specifications.  Finally, Thermo King also sent an email in November 2001 indicating that it would not be making a unit decision until May 2002.  Isuzu points to nothing in the record indicating that Isuzu was alarmed at this email, or that they informed Thermo King there had been a misunderstanding as to whether Thermo King was already committed.  In sum, it is unremarkable that companies discussing a project of this scale would begin discussing the project's timetable before entering into binding commitments. Indeed, such early discussions were likely indispensable, as it is inconceivable that a company could commit itself to the production levels contemplated in this business relationship without first knowing when that production would need to take place. Nothing in the parties' discussion of such timetables in this case plausibly demonstrates that Thermo King had made a legally enforceable promise to purchase volume quantities of engines.

In sum, even taking the record in the light most favorable to Isuzu, the Court concludes that Isuzu has not brought forward legally sufficient evidence of a "clear and

---

[4] As noted above, there are handwritten notes on this specification list that suggest that there were still issues relating to the engine's design that had not been resolved.

definite" promise that Thermo King would purchase volume quantities of the 4LC2.  In short, Isuzu had ample, repeated notice that there were additional bridges to cross before Thermo King would have a binding obligation to purchase such quantities, and as a sophisticated, experienced engine supplier, Isuzu should have been well aware of the risks of proceeding without written or explicit assurances.  Accordingly, Thermo King's motion for summary judgment is granted as to Isuzu's promissory estoppel claim arising out of Thermo King's alleged promise to purchase volume quantities of the 4LC2 engine.

### 2.      Promise to Pay Tooling and Development Costs

Isuzu also argues that Thermo King promised to pay for certain tooling and development costs specifically discussed by the parties.  As explained above, Isuzu sent Thermo King a letter on October 31, 2000, proposing that Thermo King cover a portion of its tooling and development costs.  (Bedel Aff., Docket No. 103, Ex. 16.)  In response, Gregg Johnson wrote on behalf of Thermo King: "I will approve proceeding with the tooling and development based on the latest proposal dated October 31, 2000."  (*Id.*, Ex. 14.)  In addition, Isuzu's notes from meetings in January, July, and October of 2001 also appear to indicate that Thermo King agreed to bear these expenses.  (*Id.*, Exs. 17, 20, 25.)  This evidence is clearly sufficient to convince a reasonable juror that Thermo King made a clear and definite promise to pay for the specific tooling and development costs referenced in Isuzu's October 31, 2000, letter.  Accordingly, Thermo King's motion for

summary judgment is denied to the extent that it challenges Isuzu's efforts to recover those costs.[5]

### B.   Thermo King's Alleged Promise to Purchase 150 Prototype Engines
(Count III)

Isuzu also contends that Thermo King agreed to purchase 150 prototype engines, but ultimately purchased only 50. In support of this promise, Isuzu points to (1) the recollections of a Thermo King agent; (2) an email where Isuzu suggests a price for these units, (*see id.*, Ex. 13); and (3) an email where Isuzu objects to Thermo King's suggestion that they reduce the number of units to 100. (*See id.*, Ex. 16, at 1.) Isuzu also points to signed minutes from the October 17, 2001, meeting between Thermo King and Isuzu where the parties appeared to agree on a shipping and payment schedule for the additional units. (*See id.*, Ex. 25, at 4.) Thermo King briefly responds that this claim should be dismissed, because the engines did not meet its specifications. Thermo King points to a specific email where it appears to reject an offer by Isuzu to ship non-conforming prototypes. (Steinlage Aff., Docket No. 96, Ex. C-5.)

The Court agrees that when the record is viewed in the light most favorable to Isuzu, this portion of its promissory estoppel claim is also sufficient to survive summary judgment. As an initial matter, as Isuzu notes, a Thermo King agent flatly stated in his deposition that Thermo King "requested that 150 engines be . . . made," and that the

---

[5] The Court notes that at oral argument, Thermo King raised questions about whether Isuzu ever actually incurred the tooling and developments costs that it is now asking Thermo King to cover. This issue was not raised in Thermo King's brief, and therefore will not be addressed here, but the Court notes that if this case goes to trial, Isuzu will of course be required to demonstrate its losses with evidence.

parties agreed on a price for those engines.  (Bedel Aff., Docket No. 36, at 90-91.)  In addition, a November 1, 2000, email from Isuzu to Thermo King asserts that Thermo King "clearly stated" that it "will take 150 units . . . as scheduled originally."  (*Id.*, Ex. 16, at 1.)  While Thermo King later contended that it should not be required to accept the engines because they did not meet its expectations, Isuzu contends that the engines were adequate.  The Court does not find sufficient evidence in the record on these specific engines' qualities to resolve this dispute as a matter of law.  In sum, a reasonable juror could conclude that Thermo King made a "clear and definite" promise to purchase the additional prototypes.  Accordingly, Thermo King's motion for summary judgment is denied as to Isuzu's claim seeking payment for those engines.

## III.    UNJUST ENRICHMENT (Count I)

"To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay."  *ServiceMaster of St. Cloud v. G.A.B. Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (internal quotation marks omitted).  "Unjust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term unjustly could mean illegally or unlawfully."  *Id.* (internal quotation marks omitted).  Moreover, "[t]he theory of unjust enrichment is based on what the person allegedly enriched has received, not on what the opposing party has lost."  *Georgopolis v. George*, 54 N.W.2d 137, 142 (Minn. 1952).

Isuzu argues that Thermo King unjustly received the following benefits: (1) Thermo King was able to use Isuzu's designers and engineers to refine its concepts for future engine use; (2) Thermo King received plans and a thoroughly tested prototype engine that will shorten the development cycle for any future engine projects; (3) Thermo King benefited from having an engine manufacturer "on-call"; (4) Thermo King enjoyed "freedom from worry of expense," in that it did not have to worry about the costs of any changes it ordered in Isuzu's design; and (5) Isuzu's engine development gave Thermo King leverage in its negotiations with other engine manufacturers.

Thermo King argues that Isuzu understood well that both parties were accepting some risk in this project. Thermo King notes that it also devoted significant resources to the project; that it provided Isuzu with testing results, research, and market information; and that it was forced to rely on another engine manufacturer by "default." In sum, Thermo King contends that Isuzu did not produce an adequate engine, and that there would be nothing equitable about forcing Thermo King to subsidize Isuzu's efforts.

The Court agrees that as to the benefits that Thermo King allegedly received in the course of the 4LC2's development – based on an alleged promise to eventually purchase volume quantities of that engine – Isuzu's claim must be dismissed. In short, as explained above, the Court finds no evidence in the record that Thermo King made a binding commitment to purchase the tens of thousands of engines contemplated in the tentative production schedules. In the absence of such a binding commitment – or some other adequate evidence of unfair dealing on the part of Thermo King – the Court is left without a basis for concluding that anything gained by Thermo King during the general

course of the engine's development was gained unlawfully or illegally, or otherwise departed from the ordinary sharing of risks and rewards in cooperative business ventures. Accordingly, the portion of Isuzu's unjust enrichment claim that relates to what Thermo King gained in the general course of the engine's development is dismissed.

However, as to Thermo King's narrower alleged promise to pay for specific development and tooling costs – and any unjust enrichment that may have arisen out of a commitment to cover those specific expenses – the Court agrees that this portion of Isuzu's claim should go forward.  As explained above, the Court concludes that it is properly left to a jury to determine whether Thermo King made a binding commitment to cover the specific tooling and development expenses referenced in Johnson's November 2001 letter.  Accordingly, any enrichment of Thermo King that arose out of that specific promise – that is, any enrichment that resulted from Isuzu making the disputed tooling and development expenditures itself, with the expectation that it would later be reimbursed for a portion of those expenses – may well be enrichment that Thermo King should in good conscience pay for, and is plausibly recoverable through a claim for unjust enrichment.  Thus, Thermo King's motion for summary judgment is denied as to this aspect of Isuzu's unjust enrichment claim.[6]

This case will be placed on the Court's next available trial calendar.

---

[6] The Court cautions, however, that this should not be construed as a window through which Isuzu may pursue recovery for every alleged benefit that Thermo King received throughout the course of the 4LC2's development.  To reiterate, Isuzu will only be permitted to recover for enrichment that it can specifically tie to Thermo King's promise to pay for the specific tooling and development costs referenced in Johnson's letter.  The Court further emphasizes that Isuzu's recovery pursuant to this claim will be limited to what Thermo King actually received, as opposed to what Isuzu expended.  *Georgopolis*, 54 N.W.2d at 142.

**ORDER**

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Thermo King's Motion for Summary Judgment [Docket No. 93] is **GRANTED in part and DENIED in part** as follows:

1.      As to Count I of Isuzu's complaint, alleging unjust enrichment, Thermo King's motion is **DENIED** to the extent that it alleges that Thermo King benefited from any tooling and development expenditures made by Isuzu in reliance on Johnson's alleged November 3, 2000, promise to compensate Isuzu for a portion of those expenses. As to all other unjust enrichment allegations, Thermo King's motion is **GRANTED**.

2.      As to Count II of Isuzu's complaint, the motion is **GRANTED** as to Isuzu's allegation that Thermo King made a clear and definite promise to purchase volume quantities of the 4LC2 engine.   The motion is **DENIED** as to Isuzu's allegation that Thermo King made a clear and definite promise to pay for the specific tooling and development costs referenced in Johnson's November 3, 2000, letter.

3.      As to Count III of Isuzu's complaint, which alleges that Thermo King made a clear and definite promise to purchase ninety-six additional prototype engines,[7] the motion is **DENIED**.

DATED:   September 30, 2009          _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                     JOHN R. TUNHEIM
                                              United States District Judge

---

[7] The parties expressed confusion at the hearing as to the number of prototype engines at issue.  Ninety-six, however, is the number alleged in Isuzu's complaint.  (Compl., Docket No. 1, ¶ 77.)